Linda BONEBRAKE, Petitioner

v.

Larry NORRIS, Director, Arkansas Department of Correction, Respondent

No. 5:00CV00425 JFF.

United States District Court, E.D. Arkansas, Pine Bluff Division.

Dec. 4, 2003.

Linda Bonebrake, Paragould, AR, Pro se.

Joseph V. Svoboda, Arkansas Attorney General's Office, Little Rock, AR, for Respondent.

## MEMORANDUM AND ORDER

FORSTER, United States Magistrate Judge.

Before the Court is the Petitioner's petition for writ of habeas corpus.

On June 21, 1994, Petitioner was found guilty, following a jury trial in Yell County Circuit Court, of possession of a controlled substance with intent to deliver. She was sentenced to twenty years in the Arkansas Department of Correction (ADC) and assessed a fine of $2,000. On June 22, 1994, Petitioner executed a bail bond and was released from custody pending appeal. On December 6, 1995, the Court of Appeals of Arkansas affirmed Petitioner's conviction.

*Bonebrake v. State,* 51 Ark.App. 81, 911 S.W.2d 261 (1995). On December 27, 1995, the Court of Appeals issued its mandate affirming Petitioner's conviction. Petitioner was not taken into custody to begin serving her sentence until July of 2000.

On November 28, 2000, Petitioner filed her habeas corpus petition in this Court alleging that the State failed to take the necessary action for her to be turned over to the ADC. Petitioner claims that as a result of this failure, she was left free for almost five years instead of being allowed to commence the serving of her sentence. Petitioner contends that by its gross negligence, the State has waived jurisdiction.

The evidence received at two evidentiary hearings held in this case establishes the following facts. On December 29, 1995, the mandate affirming Petitioner's conviction was received and filed in the Yell County Circuit Court Clerk's Office in Dardanelle, Arkansas. The mandate provided that "unless appellant shall forthwith surrender herself to the Sheriff of Yell County in execution of said judgment, his bond [shall] be declared as forfeited." At some point in December of 1995 or early January 1996, Bill Strait, who prosecuted the case at trial, received a copy of the December 6, 1995, opinion of the Court of Appeals affirming Petitioner's conviction from the Attorney General's Office. Strait was aware at the time that Petitioner was on bond pending appeal. Strait testified that he did not recall taking any action after receiving the opinion. He also testified that he did not recall having any communication from the clerk's office concerning the mandate affirming Petitioner's conviction. Mr. Strait testified that his office did not have any docketing procedure or other procedure that would have tracked Petitioner's case or created an alert after the appeal was decided. Mr. Strait stated that the prosecutor from Pope County contacted him about the case

after he (Strait) left office at the end of 1996. Mr. Strait did not recall giving his successor, Jerry Don Ramey, any information about the case or discussing the case with Ramey. Mr. Strait testified that his office did not have a procedure for picking up a defendant after the mandate was issued. He stated that he assumed it was a law enforcement duty.

Melinda Piatts, a deputy clerk at the Yell County Circuit and County Clerk's Office, testified that at the time Petitioner's mandate was issued, the clerk's office did not have a procedure for noting whether a mandate had been sent out or not. She stated that she is not sure if the mandate was forwarded to anyone outside the clerk's office. Ms. Piatts stated that the current procedure for handling a mandate is to file-mark the mandate and cover sheet, take the mandate to the sheriff's office and bondsman, and make a notation in the docket book where the mandate was sent and on what date it was sent.

Paul Lee, the public defender who represented Petitioner at trial and on appeal, testified that he knew he informed Petitioner that her appeal had been denied because he checked some of his records. He stated that his phone message book indicates that Petitioner called him nine times from July to March. Mr. Lee testified that he could not determine what year the calls were made. He stated that he believed that after Petitioner's appeal came down, Petitioner called his office and he told her that her appeal had been denied. He stated that his general practice is to write a letter to the client at the end of a case and to put the letter in the client's file. Mr. Lee stated that he did not find a letter in Petitioner's file informing Petitioner that her appeal had been denied. He stated that he did not know whether he sent such a letter to Petitioner. Mr. Lee testified that in 1997 or 1998, he

talked to Petitioner while visiting at St. Mary's Hospital in Russellville, Arkansas. Mr. Lee testified that Petitioner said something to the effect that "they've lost" or "they've forgotten about me or something." Lee testified that he told her that she was "going to have to just turn herself in."

Tommy Smith, Petitioner's ex-brother-in-law, testified that Petitioner lived on his property in Pope County in a trailer from about June of 1998 until December of 1998. Pope County is adjacent to Yell County. Mr. Smith testified that around February of 1999, he became angry with Petitioner and went to the sheriff's department to find out why Petitioner was still out and why nothing had come down on her appeal. He talked to one of the deputies, who sent him to the county clerk's office. Smith testified he went to the clerk's office and talked to Melinda Piatts. Piatts told Smith to go to the prosecutor's office. Smith did so. A prosecutor was not available, and Smith asked a secretary why Petitioner was still out. She replied that if anything had come down, it already should have been served.

Petitioner testified that at the time she executed the bail bond on June 22, 1994, she resided near Russellville. Russellville is about six miles from Dardanelle, the location of the Yell County Circuit Court. From 1996 to 1998, Petitioner worked at a nursing home in Russellville and for a short time at Wal–Mart in Russellville. Petitioner testified that while working at the nursing home she saw the sheriff. She testified also that while working at the nursing home she sometimes went to lunch at St. Mary's Hospital, which was across the street from the nursing home. Petitioner testified that from 1998 until July of 2000, she worked at Area on Aging in Russellville. From June 22, 1994, until July of 2000, Petitioner lived just outside Russellville, except for a six-month period

in 1996 when she lived in Newton County. Newton County is adjacent to Pope County. Petitioner stated that she saw Carl Wetzel, a deputy sheriff in Pope County, almost every day. Wetzel taught school in Dover where her children attended school. She testified that Wetzel knew about her case and asked her about how her case was going on one occasion. Petitioner also stated that her family doctor's clinic is in Yell County and that she and her children went to the clinic.

Petitioner testified that after her case was appealed, she called her counsel, Paul Lee, on several occasions and asked him about her appeal and what she was supposed to be doing. She stated that Mr. Lee told her that when her appeal was resolved, the authorities would contact him or her. She stated that she was never contacted.

Petitioner was arrested by the Pope County Drug Task Force in July of 2000. Her name at the time was Linda Wilson. Petitioner testified that in 1997 she changed her last name from Bonebrake to Wilson, her maiden name, because she had gone through a divorce. Petitioner was released on the same day of her arrest. Petitioner testified that about a week later, she saw an article on the front page of a newspaper stating that she had been hiding. Petitioner testified that she called the Yell County Sheriff's Office and asked what she should do. She was told to turn herself in within two hours, and she did so on or about July 7, 2000. Petitioner was subsequently transferred to the ADC. Petitioner testified that at the time of the newspaper article, she did not know her appeal had been denied or that a mandate had been issued for her arrest.

The parties have stipulated that from 1995 to 2000, Petitioner was not in hiding.

A State may waive jurisdiction by delaying incarceration of a prisoner for

an inordinate amount of time. The waiver theory is premised on the Fourteenth Amendment's protection against arbitrary and capricious government action. *Shelton v. Ciccone,* 578 F.2d 1241, 1244–46 (8th Cir.1978). In order to establish waiver, "it is not sufficient to prove official conduct that merely evidences a lack of eager pursuit or even arguable lack of interest." *Shelton v. Ciccone,* 578 F.2d at 1244 (quoting *Piper v. Estelle,* 485 F.2d 245, 246 (5th Cir.1973)). The habeas petitioner bears the burden of establishing that the state's action was so "affirmatively wrong" or its "inaction so grossly negligent" that requiring her to serve her sentence would be unequivocally inconsistent with "fundamental principles of liberty and justice." *Shelton v. Ciccone,* 578 F.2d at 1244 (quoting *Piper v. Estelle,* 485 F.2d at 246). "[T]he state does not deny a prisoner due process when the prisoner himself is responsible for the delay in his incarceration." *Camper v. Norris,* 36 F.3d 782, 785 (8th Cir.1994).

In *Shelton,* the petitioner's federal judgment and commitment forms lay unexecuted in the hands of United States Marshals for over seven years. During the seven-year period, the petitioner was confined in state and county custody on three separate occasions, but no federal detainer was lodged with his records. For about nine months during the seven year period, Petitioner allegedly was in visual contact with the same agents who prosecuted him on the federal charges. At the time of his arrest, Petitioner was living openly under his own name and was gainfully employed. After he was taken into custody, the petitioner was told that the United States Marshal had been holding the commitment order against him for seven years. Petitioner subsequently filed a petition for writ of habeas corpus in federal district court alleging that the delayed execution of the judgment and commitment papers constituted a violation of his right to due process

of law. The district court dismissed the petition without an evidentiary hearing, and Petitioner appealed to the Eighth Circuit.

The Eighth Circuit held that the circumstances alleged permitted an inference that although aware of Petitioner's whereabouts, the Marshals "purposely or out of extreme neglect did not attempt to execute the judgment and commitment papers for seven years." The Eighth Circuit also found that "[t]he claims also suggest that the Marshals may have chosen April, 1977, as the time to apprehend Shelton in response to the civil action in Tennessee." The Eighth Circuit concluded that "[s]uch inferences, if proven to be true, constitute gross negligence or an arbitrary and unwarranted exercise of their powers by the U.S. Marshals." *Shelton v. Ciccone,* 578 F.2d at 1245. The Eighth Circuit then stated:

> The waiver theory encourages responsibility and accountability on the part of the Marshals to the extent that it deters the arbitrary exercise of their power. In addition, the theory encourages the prompt rehabilitation of defendants. It is based on the philosophy that a defendant should be allowed to do his time, live down his past, and reestablish himself. Permitting a sentence to go unexecuted does not encourage rehabilitation. *White v. Pearlman,* 42 F.2d 788 (10th Cir.1930). The instant case demonstrates the problem. At the time of his arrest in April, 1977, Shelton was living openly under his own name an was gainfully employed. The arrest interrupted his reintegration into the community. See, *Lanier v. Williams,* 361 F.Supp. 944, 946 (E.D.N.C.1973).

> The fundamental principle of a petition for a writ of habeas corpus is that "government must always be accountable to the judiciary for a man's imprisonment"

and that the restraints on liberty must be removed if the imprisonment does not conform to the basic requirements of law. *Fay v. Noia*, 372 U.S. 391, 401–402, 83 S.Ct. 822, 829, 9 L.Ed.2d 837 (1963) .... The instant petition and accompanying affidavit set forth sufficient facts to permit the inference that Shelton has been denied due process and thus has cause to challenge the legality of his custody under the circumstances. *Preiser v. Rodriguez*, 411 U.S. at 484, 93 S.Ct. at 1833, 36 L.Ed.2d at 439. Accordingly, we reverse and remand for an evidentiary hearing to explore the merits of petitioner's claims.

*Shelton v. Ciccone*, 578 F.2d at 1245–46.

█ Under Arkansas law, the circuit clerk, upon receipt of the mandate affirming a conviction, is required to immediately file the mandate and notify the sheriff and bail bondsman "that the defendant should be surrendered to the sheriff as required by the terms of the bail bond." Ark. R.App. P.Crim. 6(c)(3). In this case, the circuit clerk's office, through gross negligence, failed to notify the sheriff after receiving the mandate affirming Petitioner's conviction. As a result, Petitioner was not taken into custody to serve her sentence. The Court also finds that law enforcement authorities played a part in the inordinate delay in Petitioner's incarceration. The prosecutor's office had no procedure in place to help ensure the timely execution of a prisoner's sentence after her conviction was affirmed and the mandate was issued. Furthermore, although the prosecutor knew that Petitioner's conviction had been affirmed, he failed to take any followup action or inform his successor that the Petitioner's case was outstanding. Also, law enforcement authorities were put on notice in early 1999 by Tommy Smith of Petitioner's situation. It is also important to note that Petitioner was present in Yell County on several occasions after the mandate was issued.

The Court finds that Petitioner was not responsible for the delay in her incarceration. The parties have stipulated that Petitioner was not in hiding. She was gainfully employed in Russellville from 1996 to July of 2000, and she resided near Russellville for all but six months from June 22, 1994, until July of 2000. The Court credits her testimony that she was not aware that her appeal had been denied or that a mandate had been issued until about July of 2000.

In conclusion, the Court finds that the State's inaction was so grossly negligent that requiring Petitioner to serve her sentence would be unequivocally inconsistent with fundamental principles of liberty and justice. Accordingly, the Court finds that the writ of habeas corpus shall issue. Respondent shall immediately release Petitioner from custody.

THEREFORE, the Court grants Petitioner's petition for writ of habeas corpus. The Court orders the Respondent to immediately release Petitioner from custody.

### JUDGMENT

It is Considered, Ordered, and Adjudged that Petitioner's petition for writ of habeas corpus is granted. Respondent is ordered to immediately release Petitioner from custody.